Good morning. Stephen Woodruff on behalf of Petitioner Catherine Torres. There are three issues in this case, but I'd like to begin with a couple of very important overriding points that apply to this case. First of all, Congress extended application of the INA to the Northern Mariana Islands with a transition period. The clear purpose of Congress with that transition period was that to have the administration and enforcement of U.S. immigration law in the CNMI, which had previously enforced immigration laws on its own, to be implemented flexibly and with sensitivity to the unique circumstances of the CNMI and the people who live there. Unfortunately, as this case shows and many other cases that show, that's not really what has happened. And that principle of flexibility and sensitivity is part of the problem with this kinds of decisions that we end up having to bring to this, excuse me, having to bring to this court. The second important point that I want to make is that an adjudication in which all of the elements, all the material elements are defined or deemed to be established is not a real adjudication. Because you can't get anywhere. There's really nothing for the court to evaluate. I guess this is a disagreement with Minto, basically. Is that what this last sentence? Absolutely. That's a disagreement with Minto. And I point out that Judge Bennett was not here when we talked about this at some length yesterday. But is Torres a person who has a claim to being legally, I mean, is he a person from 1806 he would otherwise apply if it applied? Absolutely. Yes. And why? Well, for a very simple reason. First of all, a physical document called an umbrella permit is not mentioned in 48 U.S.C. 1806E. An umbrella permit is something that the CMI government implemented to try to smooth the process to the transition to federal immigration control. Is it, this is something that we're wrestling with. What does it look like? Is it embodied in a thing that looks, a piece of paper that looks like a permit? Or is it some, is it just having a copy of the order? Is that sufficient? Do you have to have some paper, in other words? Well, there is a paper that is called an umbrella permit. But 48 U.S.C. 1806E does not require you to have any specific evidence or documentation of your lawful status under CMI immigration law. It says if you have lawful status under CMI immigration law, then you're entitled to the protections of that. So, two things. Why do Tories have that status? Well, actually that status is extremely clear in Tori's case because she had ongoing litigation, actually federal litigation, for a pregnancy discrimination claim. And there's a decision, and it's in the record, and I think it's in my brief also, there's a decision of the Commonwealth Supreme Court, the Rivera case, that explicitly says that aliens who have ongoing contract or constitutional or other claims, any claims involving their property interests, which clearly this was the claim that involved their property interests, are entitled to remain in the Commonwealth and work so long as their case is pending. Counsel, you agree that this argument is foreclosed by Minto, correct? Well, yes and no, Your Honor. Minto is a very difficult case to deal with. But I think that Minto can be distinguished. There are a number of ways to distinguish but obviously this panel isn't the panel that can overrule Minto. But Minto should be narrowly applied. How do we distinguish Tori's case from Minto's? Well, Your Honor, one thing that Minto is interesting because, well, the facts are quite different because there's a criminal case involved as well and so on, but that's not really the most important point. Would you argue that the fact that she had ongoing litigation constituted a valid entry document? Well, Your Honor, the government loves to rely on legal fictions. They generously rely on them. This whole thing is built on a legal fiction. Which brings me to my point. If the government can rely on legal fictions, then I guess that petitioners can rely on legal fictions also. An umbrella permit would never be recognized by CBP as an entry document. So it's kind of hard in a logical, factual, non-fictional sense to consider 48 U.S.C. 1806E status as an entry document. And if she had the... You're a little bit... I'm just saying, this gets back to what we were discussing yesterday. Has your experience, as a practical matter, has the government been treating these people with umbrella permits as legally present and therefore not removable? I mean, if there was no dispute about whether they had an umbrella permit, even though their legal position seems to be it doesn't matter. Actually, no. I'm going to say no because for the case yesterday, Mr. Moak's case, he had an umbrella permit. Why are we... One other question about umbrella permits, I'm sorry if this is sort of getting off the legal issue, but from some of the material they read, it appears that the umbrella permits were really for people who had overstayed. No. Is that right? It was for anybody who wanted to claim legal status. Right, right. I see. Okay. Well, that's helpful. Absolutely. It was important to the alien, it was important if the CNMI thought that they were overstayers. Now, first of all, you need to recognize that there's a whole lot of ambiguity on who was and was not an overstayer under CNMI law. But basically, the umbrella permits were for anybody who wanted to claim status. That is correct. All right. Go on with your legal argument. The Commonwealth's purpose in doing the umbrella permits was to ease the transition. The Commonwealth was very concerned about losing its labor force. They even challenged it in federal court, which I thought was a foolish challenge, but in the D.C. District Court. All right. Here, your position is that she did have legal status, although she didn't have an umbrella permit. Yes. Did she apply for an umbrella permit? She did apply for an umbrella permit. The problem was that the Commonwealth government was refusing to issue umbrella permits. Even this was their own program and their own policy. They excluded anyone whose litigation involved a federal claim from the umbrella permits. They refused to issue the document to the people who had federal claims, although they did it for all CNMI claims, and they did it because of their animosity toward the federal government at the time. That's the only reason, and that's in the record, by the way. I spoke on it. Did she have, just to clarify, did she have a temporary employment permit during this period of time due to the discrimination action? That's why the record includes her temporary authorization to seek employment. That particular document itself does not authorize her to work. The CNMI, although the case, the Supreme Court case, authorizes the person to work, they still had to process with the CNMI Department of Labor. They had to have an approved employer. That was the system that was in place. Consequently, that authorization document, which shows her status can be inferred from that document, but that document showed that she was entitled to be treated as legally present in the CNMI and able to be employed if she complied with all the regulatory requirements. That's what that document represented. Your Honor, I notice my time is actually just running out right now. I do hope I'll be allowed some time for rebuttal. Also, with regard to the physical presence issue, that's well briefed. That argument is foreclosed by Esh V. Holder, isn't it? No, it's not. Esh V. Holder can easily be distinguished. First, Esh V. Holder, as I explained in my brief, was wrongly decided. Aside from that, that arose in the naturalization context. This is a removal context, very different context. The Supreme Court recognizes the very significant impact on aliens of being brought in removal proceedings. You can't apply the same standard and procedures. In any event, we have an unpublished opinion, but no published opinion, applying Esh V. Holder to removal proceedings. Is that right? That is correct, Your Honor. It's a cancellation? There's no reasoning in that unpublished decision that is really informative or instructive to the court. It's just basically accepting in the removal context. I think that would be a very big mistake, and Esh V. Holder should be distinguished. All right. Thank you, counsel. Thank you. May it please the court, Lisa Damiano on behalf of the Attorney General. Nice to see you again, Your Honors, and for the first time, Judge Bennett. As a preliminary point, this case involves two issues, and that's the removability component and then the relief from removal, the cancellation of removal. We argued in our briefs that removability was waived. The petitioner's opening brief didn't mention removability at all. It only focused on cancellation of removal. I thought it did raise it in part. No. Actually, the petitioner's opening brief didn't mention it at all. Her issues were with regard to the physical presence component of cancellation, the overarching policy concerns for those present in the Marianas, but she didn't raise removability at all. We would argue that it's waived. Actually, the petitioner's counsel but he asks the court. This is a question of what was raised here as to exhaustion. Right. Are you making an exhaustion argument as well? No. I see. Just a waiver. The reply brief raises the removability issue for the first time, and petitioner asks the court to let those issues come in belatedly because she switched counsel and because it's an important issue. But you did have the opportunity to reply, and it's a purely legal issue. Yes. Even if it's not waived, we have argued that this case is squarely foreclosed by Minto. Under the plain language of the statute, she was an intending immigrant, which is the definition of immigrant is every- It's not under the plain language. It's under the plain language as augmented by another presumption. I mean, plain language that says anybody who is not a non-immigrant is an immigrant, but it doesn't say anybody who's an intending non-immigrant is an intending immigrant. In other words, presumably what she was trying to get was not an immigrant visa. The definition of immigrant in the INA at 8 U.S.C. 1101 A-15 states that an immigrant is every alien present except those who have shown themselves to be in a particular non-immigrant category. But you're talking about intending immigrants, so if we're talking about intending, don't we consider what they're actually intending? The law considers every alien to be an immigrant. Even if they're not an intending immigrant, an immigrant. Again, going back to the transition on November 28, 2009, every alien present in the Mariana Islands on that date was assumed to be present without admission in the United States. Counsel, I understand this argument that this question may be foreclosed by Minto, but I'd like to know the government's view as to why the terms applicant for admission and application for admission should be interpreted exactly the same. Well, the INA defines applicant for admission, not application for admission. As you mentioned, there's a distinguishing phraseology. But the law has presumed under Matter of Valdez, presidential board decision, and other decisions, Matter of Valenzuela, Felix, that an alien in this particular position is making a continuing application for admission. She's present in the U.S. without admission on the date of the transition, and she needs to seek admission. She needs to seek inspection and admission. So the law, as the board has interpreted it, is that a person in her position is making a continuing application for admission to the United States. Is there a case, a board case, not in the CNRA context, which applies this theory of subsection 7A? In other words, that anybody who is, A7, I'm sorry, 1182A7, that is that anybody who is in the country illegally is deportable under 1182A7 because of this set, this interpretation of what time for application for admission, and the assumption about application, about applicants, and the assumption about continuing application, and the assumption about who's immigrants, and you put all that together, and you have 1182A7 applies to anybody who is in the United States having come in without permission. In other words, anybody who's deportable, removable under 1182A6. I'm not sure, Your Honor, if there's anything that says anybody or everybody present in the United States. But that's your position now. But the position is that everyone in the Marianas was present. But what does Marianas have to do with it? I mean, your interpretation of 1182A7 is not limited to the Marianas, right? It's anybody who is in the United States having arrived illegally or without, right, anybody. So therefore, it's anybody who would be removable under 1182A6. Yes. So the statute- There's a complete overlap, as I understand it. There's a, the statute 8 U.S.C. 1225A1 states that an alien present in the United States who has not been admitted or who arrives in the United States shall be deemed for purposes of this chapter an applicant. I understand that. But I'm asking you if there is any case before the CNRA situation, which is so held. I'm not sure, Your Honor. I would have to look into that and provide the court with a, you know, a supplemental brief or letter after the fact. But I can't think of anything at this time. I mean, what the court is asking is for us to ignore the Minto decision, which might be- Well, no, I'm asking you to explain it. I mean, I- How do we arrive? Is Minto a CMMI, CMMI interpretation of A7 that applies to CMMI only in this transition period? Or has, is there a history and tradition of applying and reading A7 the way it's being read and applied to the CMMI transition? I don't believe it's just being applied in the CMMI, the Marianas context. They do, that Minto decision does cite to a board decision that discusses this continuing application for admission. But again- Right, but that's a different question. It's a question of this, whether it is applied to people in this situation outside of the CMMI. We may ask for supplemental briefing on that, because obviously we've had so many of these cases. Aside from that question, what is your, the government's perspective on why we have so many of these cases right now? Like, what's happening and why are we just seeing them? Because it seems this is my first encounter. Okay, well, so the law changed in 09, we know, the end of 09. And so it took a while for the Department of Homeland Security to determine who wasn't, in their opinion, who wasn't present with any sort of admission to the United States or who hadn't received a U.S. immigration document. So they placed a lot of those people in removal proceedings in 2010 and 2011, and then it had to work its way through the board and then up to this court. These cases are all 2013 cases. They were briefed in 2014 and we're just now arguing them. Was DHS, this is the question I asked yesterday, were you, were they removing people who had uncontested umbrella permits? As to whom, there was no question that they did have an umbrella permit. I'm not aware of any cases. Because, see, the umbrella permit, as Petitioner's Counsel stated, is a creature of the Commonwealth. Right, I know. It was only created to give those people that were not in lawful status, a lawful status, so that on November 28, 2009, they could then petition the U.S. government. They weren't in lawful status, I know, but the ability to, as I understand it, the CW-1 visa wasn't even available until October of 2011. And that's why you had this two-year period, so that you can get the regs in place and get people to apply and get them these visas, right? Is that the way it was administered, even though your legal position is that people, as I understand it, or is it, that people with, who actually uncontestably had these umbrella permits, were still removable? Is that your position, first of all? No, I haven't seen a case where somebody... Well, yesterday we had a case where someone was put in removal proceedings, even though they had a conditional permit from the CNMI, and they were put in removal proceedings, they were instituted before November 11, and it was either you or your colleague yesterday who said, made the representation to us that having that permit was irrelevant. Yes, that was my case, and that person did not have an uncontested umbrella permit. I was saying that even if they had an uncontested umbrella permit, it wouldn't matter for this particular case, because the whole point of this situation and these removal proceedings is that everyone in the Marianas needed to ask the United States government for a visa or status, and the people you're seeing before this court are the people that did not make that smooth transition. There were 22... You had filed the NTA and started proceedings during the two-year period, and you're saying that person... So it was relevant. If that person had shown you they had the umbrella permit, the government would not have been able to initiate those proceedings at that time. No, the person would have had shown that they were applying for some type of either the CW-1 visa, but there's all sorts of other visas. But they didn't have to do that until November, right? If they were lawfully present, but my case yesterday, our argument was that he wasn't lawfully present, but that it didn't matter. Let me ask you my question. Sorry, maybe I didn't... Your question... I mean, I'm at the point where I'm going to order the BIA to answer my question. My question is, what status did the umbrella permit give those persons who were not lawful U.S. citizens in that transition period? What status did it give them, and could removal proceedings be instituted against them during that period if they had that permit? Yes, yes, because the umbrella permit is a status for the Commonwealth, and it was only intended to give those people lawful presence so they could apply for a U.S. visa. So they could still be put in removal proceedings under any provision of the INA, with that narrow exception of what we discussed yesterday, 48 U.S.C. 1806. But that isn't an exception, because there was nobody who was going to be in that category because everybody who was in that category could also be removed under 1812.87. Yes, we just... Yes, Your Honor, you're right, and we just... Oh, so it's a not... So your bottom line position is that Congress created a useless exception. Congress created... Yes, if you want to put it in those terms. Yes, well, that's exactly right. That Congress created an exception. So something that didn't have to apply, that never applies. No, that people couldn't be removed for being present without admission because Congress anticipated everybody present in the Marianas on that transition date would be present without admission. So they had to then find... And they didn't think that everybody who was present in the Marianas would be somebody who was an applicant for admission without proper entry doctrines because no normal person reading those words would think that. But now you're saying that those same people were also in  Well, that could be... It could be considered pointless. And also, I mean, what came up yesterday was that Congress has plenary power, and it might not be the most sound decision. It might not be written in the best way possible. And there are a lot of interpretive documents from the period right after the passage that tell people that if you were lawfully in the CNMI, you have this two-year period without this any suggestion that, no, you can be removed under 1812-87, right? There are documents from USCIS saying that. If you had lawful presence on that date... Right. Lawful presence in CNMI. On the transition date, you could then apply. But as in this case, Ms. Torres, the transition date came and went, and she didn't apply for anything. She eventually applied for parole because she didn't have... She applied for parole before the end of the transition period. Yes. Right. So she did apply within the period that Congress intended her to apply. But when she was made known to DHS, it had been past the transition period, and she had no pending applications for petitions or visas. That's in I-213, in page 108 of the record. I thought you said she did apply during the relevant period, the two-year period. She did. But when DHS found her and issued the NTA, this is during the two-year period. Right. It was during it, not after it. Right. But when she was picked up by DHS, she didn't have any petitions or visas pending at that time. She told DHS officers that she had applied for parole. So then that was a collateral matter. She had to pursue the parole with DHS. But to DHS officers, she didn't apply for any visas or permits to remain in the U.S. So since it was... She applied for parole? At some point, she did. Before the end of the transition period. Yes, she did. And was she, in fact, legally present under the CNMI law because of her pending lawsuit or not? Or has anybody ever decided that? No, that's unclear from the record. We have... The BIA never decided that? No. Okay. So we don't know the answer to that. Her position is that she was legally present in the CNMI on the transition date, and she applied for parole before the end of the transition period. Right. And she was not granted parole. Or at least, DHS never granted her parole, is the way I understand it. But she was in removal proceedings at the time she applied for parole. She was in removal proceedings, but there is no bar to somebody applying for parole during removal proceedings. It's decided collaterally by DHS. I just want to make one point clear before my time is really up. And that is that... It's really up. Yeah, it's really up. There were over 22,400 people in the Mariana Islands in 2008 that were lawfully present. You're not seeing any of those 22,000... Are those 22,000 people who were lawfully present because they had the umbrella permits? No. The umbrella permits, this was in a letter written by the governor of the Marianas to Congress during May of 2008. There were no umbrella permits yet. But they were lawfully present in the CNMI. Right. So what I'm... So what are you saying? What I'm saying is... You're saying that doesn't matter. What I'm saying is the cases you're seeing are people who were overstayers or whose work permits had expired. This is why these people sort of slipped through the cracks or ended up in this position. They were placed in removal proceedings because they didn't have a lawful work visa at the time of the transition. And she didn't apply for... On your theory, it doesn't matter. I mean, that's why I'm having such a hard time with the government's position. Your position is that's totally or legally irrelevant, right? Because the people who had the legal status, the 22,000 people with legal status under the CNMI could be removed the day after the transition, November 28, 2009, under 1182A7, even though they couldn't be removed under 1182A6. That is your legal position. Yes. If they didn't have an application pending for some form of... What does an application pending have to do with anything? I mean, if they hadn't applied, say their employer had applied for an H-1B visa... And why does that matter? Because they were seeking a valid document from the U.S. government. But 1182A7 doesn't do anything about seeking. Right. But what I'm saying is that you don't see those cases because DHS determined that they would place people in removal proceedings who hadn't applied for any relief, who were there... But they had two years under 11806E to do it. And not only that, the special CW-1 visa that the Congress had provided for wasn't even available until October 2011. Is that correct? Yes, I believe so, Your Honor. Okay. The thing is, though, under 48 U.S.C. 1806E1, that transition period was for people lawfully present on that date. And then they could seek... Then they could say, I can't be removed under 1182A6. Lawfully present under CNMI law? On the date of the transition, yes. No, under American law. No, on the date of the transition, that exception under 48 U.S.C. 1806A1 is... Well, correct, but it was inapplicable. It didn't apply to anybody. The way you're... I mean, it only applied to those people who don't want to apply to anybody because anybody who was removable under 1806 was under 1182A6 was also removable under 1182A7. So on the ground, it applied to nobody. 1806, they couldn't be removed under 1182A6. Right, but everybody who could be removed under 1182A6 could also be removed under 1182A7. If they didn't have something from the U.S. government. Right, so therefore, the exception applied to nobody. Nobody that had, if they didn't have a U.S., yes, document. Nobody, nobody, because the exception was for people who had CNMI status and CNMI status was not adequate. It was, there could be people that had status in the U.S. and in the Marianas. People... Oh, but then they don't need it. Right. So anybody who needed it couldn't have it. They wouldn't. Let me just also go to Judge Bennett's question for a minute. Minto does not recognize at all that the word applicant for admission is not in 1182A7. It quotes it as if it is and it isn't in that. There is, so Minto goes through its reasoning on the ground that the language in the stat in 1182A7 is applicant for admission, but it actually isn't. It's time of application for admission. Well, the 1182A7 is quoted in Minto and it says, who at the time of application... I know it's quoted, but after that in the reasoning, the opinion... Right. In the opinion, then they go on to quote 8 U.S.C. 1225A1, which states an alien present in the United States who has not been admitted or who arrives in the U.S. shall be deemed for purposes of this chapter an applicant for admission. So the 1182A7 uses the term at the time of application for admission and then 8 U.S.C. 1225A1 uses the term is deemed for purposes of this chapter an applicant for admission. Correct, but not the same thing. At the time of application for admission, an applicant for admission. Right. Right. Yes. All right. Okay. There's no further questions. Thank you, Your Honors. Thank you, Counselor. I'll give you a couple of minutes given that the Governing Council doubled her argument. Well, thank you, Your Honor. I have at least 20 points of contention with the arguments of the Government Council and obviously I can't reach all of those. But I'll make a few points. First of all, Minto and the government relies on Section 1225A1 for deemed an applicant for admission and all of the reasoning flows from that. Aside from the fact that there was never any application for admission on November 28, 2009, they're deeming that to be, without mentioning it, in fact, even in Minto, they're deeming that to begin the period of continuing application for admission so that they can get around the requirement of at the time of application for admission. Counsel, how does that help you in this case, absent Minto being overruled by this court or the Supreme Court? Well, first of all, I think this court can express its views on Minto, although it can't overrule Minto. One thing that Minto Court didn't discuss and didn't really address, there's actually two that I would point out. First of all, is that all of the commentary and the analysis by EOIR itself with regard to 1225A1, is that the purpose of that is part of EOIR and the purpose of that is to funnel people being placed in removal into the correct type of removal proceeding. It's not intended to be used as a foundation for getting people into 1182A7 removal proceedings. That's an error. Secondly, the Minto Court didn't really actually address the issue of the fact that it's an immigrant that is required to have those documents. In fact, that's fundamental error because she's not an immigrant and the government is adding a requirement to 48 U.S.C. 1806E1 that doesn't exist in the statute, that you'd be applying for something with the federal government. In fact, the aliens that were put, like Ms. Torres, that were put into removal, never had the opportunity to apply for a non-immigrant status, which is the underlying premise for that argument. The government's consistent argument, and most of the time applied by USCIS, is that if you have parole and you're placed in removal, your parole is terminated. If you are in removal, you cannot be given 1182D5 humanitarian or public interest parole, which Congress surely intended to be used. But so on that side, the question is, is she an immigrant? Okay, well, there was no immigrant status in the CNMI. She was clearly a non-immigrant in the CNMI. There's no evidence that she had any intention to violate immigration law. The immigration judge faulted her for living in the CNMI a long time and having U.S. citizen children who were born here. So she's going to be punished for lawfully being in the CNMI and starting a family? That's ridiculous. But that's basically what it comes down to. That was read as suggesting that she's an intending immigrant. There's no immigrant status under CNMI's law. Her lawful status under the CNMI was a non-immigrant status, and Congress provided a two-year period of time to provide an opportunity for people to seek valid U.S. status. That's a non-immigrant period of time. So in my brief, I argued that she's de jure a non-immigrant. And I would maintain that the court should rule that in this case and distinguish Minto because Minto never addressed the question of whether or not she really was an immigrant. This is why I also argued in my brief that given that Congress enacted 48 U.S.C. 1806 E, the government has the burden of proof before they can use something like 1227, like 1182 A7, to show that the person is not a member. The burden of proof is not on the alien with regard to 48 U.S.C. 1806 E. The burden of proof is on the government. They needed to plead it in the NTA, and they needed to affirmatively approve it in the removal case. That's another issue that's not mentioned in Minto, which is another way that Minto can be distinguished. The 5th and the 11th circuits would have reached a different result with the same case. Their decisions make that clear. And an alien can't, just because the U.S. border for purposes of applying the INA moved over the CNMI on November 28, 2009, doesn't make the people that are lawfully present in the CNMI under CNMI law suddenly automatically be applying for something that they've never had an opportunity to apply for. But that also, that argument is what Minto addressed, even though, as Judge Berzon said, they may not have completely explained their reasoning for it. No, I don't think they addressed that because they don't talk about it. They don't mention it. They don't, you know, that's, there's no, there's no reasoning on that question. So they can't have addressed it because they didn't go through any kind of evaluation. Also, I want to comment on Valdez, because that's a presidential decision, supposedly, but Valdez is not entitled to Chevron deference in this case. The issue there was really whether he had abandoned his adjustment of status. And Valdez is also clearly wrong because they totally misinterpreted the USCIS policy memorandum that, that they put into the footnote. What's Valdez, if you don't mind? I'm sorry? What is Valdez, if you don't mind? Valdez is 25 INN decision 824, the BIDA decision in, in 2012, and relied on by the government in its argument. In Valdez, it's an 11-8- Just tell me what it's about. What, what, what argument does it go to, of your argument? It's, it's, it's removal under 11-82-A-7, but the alien had a, prior to being put in removal, I believe, had a application for adjustment of status based on being the immediate relative of his U.S. citizen wife. He also had a criminal conviction that was at issue. And he was, the court concluded that he had abandoned his adjustment of status. When the BIA considered the decision, they concluded that he wasn't eligible because he had not been admitted or paroled. He was not eligible for adjustment of status because he had not been admitted or paroled. His situation is exactly the situation under the covenant preservations where U.S. immigration law did apply, immediate relative of U.S. citizen, and the problem of the adjustment for immediate relatives of U.S. citizens was, the requirement of being admitted or paroled was resolved as a policy by USCIS from the time that the covenant was implemented to the, subsequently, and they resolved that by, if they found that the alien was otherwise eligible for adjustment of status, they would grant parole immediately before granting the adjustment. This was the mechanism that the, the government used to implement the covenant section and the policy memorandum that was in, that was cited in the footnote in Valdez was the extension of that policy, prospectively, from November 28th, 2009, to apply to people otherwise eligible for adjustment of status, like Mr. Valdez. Did you submit that policy memorandum? I think it was submitted, but if it's not, I can submit it, Your Honor. Thank you. And, um, your time is up. Very definitely. Thank you, Your Honor. I will, um, we will submit, uh, Tara's v. Sessions, and we will take up U.S. versus, uh, Bukatan? Bukatan? Not sure how to pronounce that.
judges: Wardlaw, Berzon, Bennett